| | |
|---|---|
| JEANETTE E. NEWMAN, and <br> NORMA E. REGISTER, <br><br> Plaintiffs, <br><br> v. <br><br> FIRST MONTAUK FINANCIAL CORP., <br> FIRST MONTAUK SECURITIES CORP., <br> KENNETH R. BOLTON, <br> VICTOR K. KURYLAK, and <br> CELESTE M. LEONARD, <br><br> Defendants. | **ORDER** |

Jeannette E. Newman and Norma E. Register sued First Montauk Financial Corporation ("FMFC"), First Montauk Securities Corporation ("FMSC"), Kenneth R. Bolton, Victor K. Kurylak, and Celeste M. Leonard (collectively "defendants" or "third-party plaintiffs") alleging violations of North Carolina law arising out of a failed investment in "Parcel Leasehold Interests" in a shopping center in Houston, Texas. Am. Compl. ¶ 1. On July 16, 2009, third-party plaintiffs filed a third-party complaint against John J. Peck, William Alexander, Legacy Lawyers, PLLC, Mark McLamb, and Edward D. Jones & Co., LP (collectively "third-party defendants") [D.E. 47]. Third-party plaintiffs request indemnity or contribution from third-party defendants. See id. On September 2, 2009, the parties moved for permission to submit a revised discovery plan [D.E. 71]. On September 11, 2009, McLamb and Edward Jones moved to compel arbitration of the claims against them and dismiss or stay the proceedings pending arbitration [D.E. 73]. Also on September 11, 2009, Peck, Alexander, and Legacy Lawyers moved to dismiss the third-party complaint [D.E. 75, 77]. On

October 19, 2009, third-party plaintiffs filed a consolidated response in opposition [D.E. 85]. As explained below, the court grants McLamb and Edward Jones' motion to compel arbitration of the claims against them [D.E. 73] and stays the proceedings pending arbitration. As for the motions to dismiss of Peck, Alexander, and Legacy Lawyers [D.E. 75, 77], the court denies the motions to dismiss without prejudice. Peck, Alexander, and Legacy Lawyers may renew the motions (if necessary) when the arbitration is complete. Finally, the parties' motion to submit a revised discovery plan [D.E. 71] is denied without prejudice. The parties may renew the motion when the arbitration is complete.

I.

Plaintiffs Newman and Register sued defendants alleging violations of North Carolina law arising out of a failed investment in "Parcel Leasehold Interests" in a shopping center in Houston, Texas. Am. Compl. ¶ 1. Newman and Register are residents of Pender County, North Carolina. Id. ¶ 6. FMFC is a New Jersey corporation with its principal place of business in New Jersey. FMFC operates Montauk Financial Group, a broker-dealer firm, through FMSC. Id. ¶ 7. FMSC, a subsidiary of FMFC, is a New York corporation with its principal place of business in New Jersey. Id. ¶¶ 7–8. FMSC is registered as a securities dealer in North Carolina. Id. ¶ 8. Beginning in 1987, FMFC has operated FMSC as a full-service brokerage firm. Id. ¶ 40. By 2006, FMSC served customers through offices in 24 states. Id. ¶ 41. FMSC employed Bolton from March 1995 until August 2007, including the time of the alleged events in the amended complaint, and is a resident of New Jersey. Id. ¶¶ 9, 42. Kurylak is the president, chief executive officer, and director of FMFC and FMSC. Id. ¶ 10. Leonard is the executive vice president and chief compliance officer for FMSC and a director for FMFC. Id. ¶ 11.

In 1991, Newman and Register inherited 28.5 acres of land in Hampstead, North Carolina (the "Hampstead property") from their mother, Madeline J. Edens. Id. ¶ 13. In 2006, WRI Hughes Surf City, LLC approached plaintiffs and offered to purchase the Hampstead property in order to

2

develop a shopping center. Id. ¶ 14. Before finalizing the transaction, plaintiffs sought advice from McLamb, a securities broker with Edward Jones in Wilmington, North Carolina. Id. ¶ 15. McLamb referred plaintiffs to Peck, an attorney with Legacy Lawyers in Wilmington, North Carolina. Id. In July 2006, Peck and Alexander, his partner at Legacy Lawyers, advised plaintiffs to enter into a "like-kind exchange of property" under 26 U.S.C. § 1031, in order to avoid certain tax consequences associated with selling the property. Id. ¶ 16.

After discussing options with Newman and Register, Peck and Alexander recommended that Newman and Register invest in a private placement through Investment Properties of America West Oaks Mall Master Leasco, LP ("IPA Leasco"). See id. ¶¶ 21–23. Essentially, this "private placement" through IPA Leasco allowed investors to purchase a leasehold interest in West Oaks Mall in Houston, Texas, which corresponded to a certain number of square feet in West Oaks Mall. Id. ¶ 24. As part of the purchase of a parcel leasehold interest, an investor agreed to assume a portion of the underlying mortgage debt on West Oaks Mall. Id. In total, IPA Leasco offered for sale 200 parcel leasehold interests which it valued at $170 million. Id.

The offering memorandum for the private placement required that broker-dealers who were members of the National Association of Securities Dealers, Inc. ("NASD") make the sales. Id. ¶ 29.[1] In return, these broker-dealers would receive commissions and expense reimbursements from IPA Leasco. Id. ¶ 29. Additionally, an "investor questionnaire" required the broker-dealer who made the sale to certify that there were "reasonable grounds to believe, on the basis of information supplied by the subscriber . . . that . . . a Parcel Leasehold Interest [is] a suitable investment for the subscriber." Id. ¶ 30.

---

[1] In July 2007, NASD and the New York Stock Exchange ("NYSE") consolidated their member-regulation operations into one self-regulatory organization, the Financial Industry Regulatory Authority ("FINRA"). See, e.g., Karsner v. Lothian, 532 F.3d 876, 871 n.1 (D.C. Cir. 2008).

3

At this point, plaintiffs' and third-party plaintiffs' descriptions of events differ. Essentially, third-party plaintiffs contend that it was not they, but rather the third-party defendants, who committed the wrongful acts alleged in the complaint. See Third Party Compl. ¶¶ 1–43.

According to plaintiffs, McLamb contacted IPA Leasco to ask about the private-placement offering and was referred to Bolton at FMSC. See Am. Compl. ¶ 31. During subsequent discussions, Bolton represented to Peck and McLamb that the "IPA Leasco offering was the best" "1031 product[]" "on the market." Id. ¶ 32. Furthermore, Bolton indicated that he was familiar with IPA Leasco's finances and that the mall was "90% leased," the mall would generate "annual returns of 7% to 9%," and the investment was "secure." Id. McLamb and Peck repeated this information to Newman and Register. Id. ¶ 34. Third-party defendants contend that McLamb, Peck, and Alexander told Newman and Register substantially the same information, but without any advice from Bolton. See Third-Party Compl. ¶¶ 23–27. In any event, Newman and Register and third-party plaintiffs agree that Bolton's assistance was sought because Edward Jones did not have a relationship with IPA Leasco; therefore, McLamb and Edward Jones were unable to act as the broker-dealer in the sale of IPA Leasco private placements. See Am. Compl. ¶¶ 31–33; Third-Party Compl. ¶¶ 25–26.

On December 6, 2006, Newman and Register sold the Hampstead property to WRI Hughes Surf City, LLC for $2,720,000. Am. Compl. ¶ 35. Newman and Register set aside $2,200,000 to invest in the IPA Leasco private placement. Id. Newman and Register allege that they relied on Bolton's representations regarding the IPA Leasco private placement. Id. ¶ 36. According to third-party defendants, between December 6, 2006, and plaintiffs' investment in the IPA Leasco private placement, McLamb and Peck exchanged e-mails regarding the investment and McLamb's anxiousness to complete the investment quickly to obtain tax benefits for plaintiffs. See Third-Party Compl. ¶¶ 30–32.

4

On February 13, 2007, Newman and Register, with Peck's assistance, completed the necessary paperwork to invest in the IPA Leasco private placement. See Am. Compl. ¶ 37. Third-party plaintiffs allege that a representative of IPA Leasco also was present. Third-Party Compl. ¶ 33. Third-party plaintiffs also allege that during this process, Newman and Register completed an investor questionnaire in which they acknowledged that they were aware of and capable of evaluating the risks associated with investing in the IPA Leasco private placement and that they "reviewed the offering document with [their] attorney John J. Peck." Id. ¶¶ 34–35; see Am. Compl. ¶ 37. Newman and Register allege that Peck thereafter faxed the paperwork to Bolton who then signed the broker-dealer representations and warranties. Am. Compl. ¶ 38. Ultimately, Newman and Register each purchased 64 parcel-leasehold-interest units for $1,099,042.70 and assumed $1,125,210.03 in mortgage debt. Id. ¶ 37. Payment was completed on February 26, 2007. Id. ¶ 39.

Newman and Register allege that FMFC, FMSC, and Bolton had a conflict of interest because Edward Okun, the head of IPA Leasco, was involved in merger negotiations with FMFC and the Okun-affiliated companies purchased a large amount of stock in FMFC during the time Newman and Register were negotiating their investments in the IPA Leasco private placement. Id. ¶¶ 40–51. Newman and Register allege that Bolton made several false and misleading statements regarding the IPA Leasco private placement and failed to disclose material information about the offering to plaintiffs. Id. ¶¶ 52–57.

Finally, third-party plaintiffs allege that after Newman and Register invested in the IPA Leasco private placement, Alexander prepared, at IPA Leasco's request, a due diligence report on West Oaks Mall. Third-Party Compl. ¶¶ 36–39. According to third-party plaintiffs, Alexander made several conclusions regarding IPA Leasco's risk profile but failed to share this information with Newman and Register. Id. 37–39.

Newman and Register allege fraud, violations of the North Carolina Securities Act, negligent misrepresentation, and breach of defendants' duty of care. See Am. Compl. ¶¶ 60–84. Plaintiffs

5

also seek to pierce FMFC's corporate veil under an alter-ego theory and request punitive damages. Id. ¶¶ 85–92.

On July 16, 2009, third-party plaintiffs filed a third-party complaint against Peck, Alexander, Legacy Lawyers, McLamb, and Edward Jones [D.E. 47]. Third-party plaintiffs request indemnity or contribution from third-party defendants. See id. On September 2, 2009, the parties moved for permission to submit a revised discovery plan [D.E. 71]. On September 11, 2009, McLamb and Edward Jones moved to compel arbitration of the claims against them and dismiss or stay the proceedings pending arbitration [D.E. 73]. Also on September 11, 2009, Peck, Alexander, and Legacy Lawyers moved to dismiss the third-party complaint [D.E. 75, 77]. On October 19, 2009, third-party plaintiffs filed a consolidated response in opposition [D.E. 85].

II.

McLamb and Edward Jones ask the court to compel arbitration of the claims against them and either dismiss the claims or stay the proceedings pending arbitration [D.E. 73]. Under the Federal Arbitration Act ("FAA"), an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; Rent-A-Ctr., West, Inc. v. Jackson, No. 09-497, 2010 WL 2471058, at *3–5 (S. Ct. June 21, 2010).

The FINRA Code of Arbitration Procedure for Industry Disputes ("FINRA Manual") Rule 13200, provides: "Except as otherwise required in the Code, a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among: Members; Members and Associated Persons; or Associated Persons." FINRA Manual R. 13200(a). The FINRA Manual binds former members and associated persons, as well as current members and associated persons. See FINRA Manual §§ 13100(a), (o), (r). The FINRA Manual constitutes an "agreement in writing" under the Federal Arbitration Act, 9 U.S.C. § 2, which binds third-party plaintiffs, Edward Jones, and McLamb, as FINRA members or associated persons,

6

or former members or associated persons, to submit an eligible dispute to arbitration. See Washington Square Sec., Inc. v. Aune, 385 F.3d 432, 435 (4th Cir. 2004); cf. Mot. Compel Exs. A–G. Moreover, third-party plaintiffs do not dispute that the FINRA Code constitutes a valid arbitration agreement in this case. See Mem. Opp'n 20–22. Rather, third-party plaintiffs contend that the dispute at issue does not fall within the scope of that agreement. See id.

Under the FAA, an arbitration agreement is to be interpreted according to the intentions of the parties. See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985); Aune, 385 F.3d at 435. Although a court interprets an arbitration agreement using principles of state contract law, "due regard must be given to the federal policy favoring arbitration." Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 475–76 (1989); Aune, 385 F.3d at 435. Accordingly, the parties' intentions "are generously construed as to issues of arbitrability," Mitsubishi Motors Corp., 473 U.S. at 626, and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24–25 (1983); see, e.g., Volt Info. Scis., Inc., 489 U.S. at 476; Aune, 385 F.3d at 436.

By enacting the FAA, Congress created a "presumption" in favor "of arbitrability." AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986). Therefore, a court must resolve any doubts in favor of arbitration and compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Id.; see, e.g., Moses H. Cone Mem'l Hosp., 460 U.S. at 24–25; Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc., 380 F.3d 200, 204 (4th Cir. 2004). Thus, "the heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration." Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co., 867 F.2d 809, 812 (4th Cir. 1989). Furthermore, where an arbitration clause is reasonably

susceptible of an interpretation that covers the dispute between the parties, only an "express provision" in the arbitration agreement excluding the dispute, or "the most forceful evidence of a purpose to exclude the claim from arbitration" suffices to preclude arbitration. See, Aune, 385 F.3d at 436 (quotations omitted).

Although the Fourth Circuit has not expressly interpreted an arbitration provision including the phrase "arises out of the business activities of a member or an associated person" as used in FINRA Manual Rule 13200, the Fourth Circuit has consistently interpreted similar language in favor of arbitration. See, e.g., Raymond James Fin. Servs., Inc. v. Bishop, 596 F.3d 183, 192–93 (4th Cir. 2010); Aune, 385 F.3d at 437; Long v. Silver, 248 F.3d 309, 316–17 (4th Cir. 2001); Zandford v. Prudential-Bache Sec., Inc., 112 F.3d 723, 728–29 (4th Cir. 1997); Am. Recovery Corp. v. Computerized Thermal Imaging, Inc., 96 F.3d 88, 92–93 (4th Cir. 1996). Similarly, most other circuits that have addressed the question have agreed that "arising out of" is a broad arbitration clause. See, e.g., Battaglia v. McKendry, 233 F.3d 720, 727 (3d Cir. 2000); see also Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc., 350 F.3d 568, 578 (6th Cir. 2003); Gregory v. Electro-Mech. Corp., 83 F.3d 382, 385–86 (11th Cir. 1996); Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd., 1 F.3d 639, 642 (7th Cir. 1993); but see Mediterranean Enters., Inc. v. Ssangyoung Corp., 708 F.2d 1458, 1464 (9th Cir. 1983).[2] Accordingly, the court considers Rule 13200 a broad arbitration clause and applies the Fourth Circuit's "significant relationship" test. See Am. Recovery Corp., 96 F.3d at 92–93.

In opposition to Edward Jones and McLamb's arbitration request, third-party plaintiffs contend that their claims do not arise out of Edward Jones and McLamb's business activities and urge the court to narrowly construe the arbitration clause. See Mem. Opp'n 20–22. In support,

---

[2] In American Recovery Corp., the Fourth Circuit expressly rejected the Ninth Circuit's standard from Mediterranean Enterprises in favor of the "significant relationship" test. See Am. Recovery Corp., 96 F.3d at 92–93.

8

third-party plaintiffs cite Valentine Capital Asset Management, Inc. v. Agahi, 174 Cal. App. 4th 606, 94 Cal. Rptr. 3d 526 (2009), Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc., 264 F.3d 770 (8th Cir. 2001), Paine, Webber, Jackson & Curtis, Inc. v. Chase Manhattan Bank, N.A., 728 F.2d 577, 580 (2d Cir. 1984), and Bakas v. Ameriprise Financial Services, Inc., 651 F. Supp. 2d 997 (D. Minn. 2009). See id. at 21–22.[3] These cases, however, do not bear the weight third-party plaintiffs place upon them.

In Valentine, the California Court of Appeals held that disputes must arise out of the business activities of an "individual as an associated person," to fall within the scope of Rule 13200's arbitration clause. 174 Cal. App. 4th at 616, 94 Cal. Rptr. 3d at 534 (emphasis omitted). The Valentine court reasoned that "an associated person[] should not have to arbitrate claims regarding matters outside his business activities as an associated person of a FINRA member." Id. at 617, 94 Cal. Rptr. 3d at 535. The claims in Valentine did not arise out of the parties' duties as associated persons. "None of the purported wrongdoing in either pleading [was] alleged to have occurred in the course of the parties' duties as associated persons with a FINRA-member firm; instead, it allegedly occurred in connection with investment advisory firms . . . who are not members of FINRA." Id. at 618, 94 Cal. Rptr. 3d at 535–36. Therefore, the Valentine court held that, although the claims involved associated persons, they did not relate to those parties' business activities as associated persons of member firms. Id. at 618, 94 Cal. Rptr. 3d at 535–36.

Unlike Valentine, Newman and Register's claims in the amended complaint and third-party plaintiffs' claim for indemnity and contribution against McLamb and Edward Jones do not relate to side business but to the business activities of member firms (FMFC, FMSC, Edward Jones) and their associated persons (including McLamb). Thus, Valentine is distinguishable.

---

[3]Third-party plaintiffs rely primarily on Valentine. See Mem. Opp'n 21–22.

9

Third-party plaintiffs also suggest that the court limit the phrase "business activities" to only the parties' "exchange-related business." See Mem. Opp'n 21 (citing Chase Manhattan, 728 F.2d at 580). In Chase Manhattan, the Second Circuit explained that "[t]he sole issue on this appeal is whether defendants, neither of which are members of the NYSE, can compel [plaintiff], which is a NYSE member, to submit its claims against defendants to NYSE arbitration." Chase Manhattan, 728 F.2d at 579. The Chase Manhattan court analyzed a NYSE provision requiring the arbitration of any dispute between a member and a non-member "arising out of the business of such member," id. n.3, and held that where "the alleged improper conduct is on the part of the non-member" the NYSE arbitration clause should be limited "to controversies arising out of the member's exchange-related business." Id. at 580. The Second Circuit reasoned that to hold otherwise would unjustifiably extend the NYSE arbitration clause to "require every exchange member, at the insistence of a non-member, to submit to exchange arbitration every dispute it has with any entity in the world no matter what the subject matter." Id. The Second Circuit, however, expressly declined to decide whether a non-member could compel arbitration of a dispute in an action in which the alleged wrongdoer is an exchange member and the transaction was not related to exchange business. Id. n.5. Likewise, the Second Circuit did not address whether a member could compel arbitration of a dispute in an action where the alleged wrongdoer is an exchange member and the transaction was related to exchange business. Thus, Chase Manhattan did not address the circumstances of the dispute at issue in this case.

As for the arbitration issue in this case, an "exchange-relatedness" requirement is not appropriate in light of the evolution of the securities industry's self-governance. When the NYSE and NASD consolidated their member operations into FINRA, they created an organization with a broader regulatory mandate. FINRA is responsible for

> regulatory oversight of all securities firms that do business with the public; professional training, testing and licensing of registered persons; arbitration and mediation; market regulation by contract for The NASDAQ Stock Market, Inc., the American Stock Exchange

10

LLC, and the International Securities Exchange, LLC; and industry utilities, such as Trade Reporting Facilities and other over-the-counter operations.

Changes to Accommodate Consolidation, SEC Release No. 34-56145 (July 26, 2007). Thus, the appropriate inquiry in this case is whether the dispute bears a significant relationship to the parties' roles as members and associated persons. See, e.g., Am. Recovery Corp., 96 F.3d at 92–93. As McLamb and Edward Jones contend, "[p]laintiffs' allegations that form the basis of this dispute arise solely as the result of their relationship with FMSC and their transactions with FMCS's agents and affiliates." Mem. Supp. Arbitration 8. Likewise, third-party plaintiffs' claims against McLamb and Edward Jones are significantly related to the parties' roles as members and associated persons. Thus, third-party plaintiffs' claims against McLamb and Edward Jones are subject to arbitration under the FAA.

Once a court determines that a claim is subject to arbitration under the FAA, the court, "on application of one of the parties[,] stay[s] the trial of the action until such arbitration has been had in accordance with the terms of the agreement" if "the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. Accordingly, where a valid arbitration agreement exists and the claims fall within that agreement, the court must grant a stay pending arbitration unless the party seeking arbitration is in default. See United States v. Bankers Ins. Co., 245 F.3d 315, 319 (4th Cir. 2001).[4]

A default arises when the party seeking arbitration "so substantially utilized the litigation machinery that to subsequently permit arbitration would prejudice the party opposing the stay." Patten Grading & Paving, Inc., 380 F.3d at 204 (quotation and alteration omitted). The party opposing arbitration bears a "heavy burden" and a court will not "lightly infer the circumstances constituting [default]." Id. (quotations omitted). To satisfy its burden, the party opposing arbitration

---

[4]Notwithstanding the plain language of section 3, dismissal may be a proper remedy "when all of the issues presented in a lawsuit are arbitrable." Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc., 252 F.3d 707, 709–10 (4th Cir. 2001).

11

must offer more than mere speculation, but must provide "concrete" proof of prejudice. MicroStrategy, Inc. v. Lauricia, 268 F.3d 244, 251–52 (4th Cir. 2001).

Third-party plaintiffs argue that an order compelling arbitration would result in unnecessary duplication of labor and would contravene principles of fundamental fairness and judicial economy. In considering third-party plaintiffs' prejudice argument, this court considers the FAA's purpose to "reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991). Thus, "the arbitrability of the arbitrable claim is not to be defeated or delayed because it is joined in the litigation with other issues not subject to arbitration." In re Mercury Constr. Corp. 656 F.2d 933, 940 (4th Cir. 1981) (en banc), aff'd, 460 U.S. 1 (1983); cf. Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 219–21 (1985) ("The preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered, and that concern requires that [the Court] rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation, at least absent a countervailing policy manifested in another federal statute."). Congress anticipated that the FAA may force parties to litigate related disputes in different forums and this fact "cannot be a basis for defeating the arbitration that Congress was seeking to encourage." In re Cotton Yarn Antitrust Litig., 505 F.3d 274, 285 (4th Cir. 2007). Rather, this possible inefficiency "occurs because the relevant federal law requires piecemeal resolution when necessary to give effect to an arbitration agreement." Moses H. Cone Mem'l Hosp., 460 U.S. at 20. Accordingly, because third-party plaintiffs' claims against McLamb and Edward Jones are subject to arbitration, the court compels arbitration and stays the proceedings pending arbitration of the claims between third-party plaintiffs and McLamb and Edward Jones. See, e.g., Choice Hotels Int'l, Inc., 252 F.3d at 709–10.

12

Case 7:08-cv-00116-D    Document 86    Filed 07/23/10    Page 12 of 13

## III.

In sum, that the court GRANTS McLamb and Edward Jones' motion to compel arbitration [D.E. 73], STAYS the proceedings pending arbitration of the claims between third-party plaintiffs and McLamb and Edward Jones, DENIES without prejudice the motions to dismiss of Peck, Alexander, and Legacy Lawyers [D.E. 75, 77], and DENIES without prejudice the motion to submit a revised discovery plan [D.E. 71].

SO ORDERED. This 23 day of July 2010.

JAMES C. DEVER III
United States District Judge